Thank you. Please call the next case. 16-0017, Saladay, 150441. A New Marriage of Robert Evanoff with Faith and Tom. Okay, will counsel for each side please approach the podium, state your name and tell us who you represent. This is a recording device, it's not a microphone, it's not an amplifier, so keep your voice up. And remember that we've read your briefs, we've read everything that you've submitted to us, so I advise you to get to your most important or your strongest argument first. At launch, you're reserved a few minutes for rebuttal. Counsel, please. Good morning, Your Honor. Michael DiDomenico from Lake Tobacco for the appellant, Clayton Thompson. Good morning, panel. Michael Wyman, W-E-I-M-A-N, on behalf of Marguerite Evanoff, the petitioner appellee. Whenever you're ready, counsel. Each side will have 15 minutes. Did I say that? Yes, ma'am. 15 minutes. Save a few minutes for rebuttal. We're not strict clock watchers, but if you're going on too long, I'll ask you to wrap up. Whenever you're ready. Thank you, Your Honor. May it please the Court. The issues in this divorce case that I've raised spread in many fields. I'll pick a place to begin, but we'll go wherever you take me. Well, I'd like you to take us to those matters on appeal that are truly of merit. You've got a case here where two appeals have been merged. You are challenging virtually every aspect of the judgment on appeal. You've set forth nine different areas that you are disputing. And if that were true, I would have to say that the circuit court judge was probably out of their mind at the time they entered the decree. And I don't believe that's the case. So I strongly suggest you go to those points that are truly those which a responsible court of review should be looking at. Please proceed. I think the overriding theme that I tried to present in the brief was a valuation mistake made by the circuit court in the judgment. The circuit court made a finding that my client would receive $900,000 upon the sale of Merrill Residence. Did she make a finding or did she make a comment? You characterized that as a finding. Was it really a finding? She said, I believe that my client is going to receive $900,000 upon the sale. And she said that while she was disposing of the other challenges he made to the property distribution. Is that in the order anywhere? I read your briefs, and I'm glad you brought that up because I wanted to ask you just that very question. Wasn't that a comment that the judge made? This was a very lengthy, protracted litigation that seemed to have gone on for a long period of time. So during the course of that litigation, the judge said a lot of things. The question as to whether or not that one statement was a finding or a holding in the context of this is what this is worth to your client. Is that your position? It's one of my positions. The post-trial motion, the disposition of the 1203 motion says I'm proceeding from the idea that my client, Clayton Thomas, said will get $900,000 upon the sale of the house. And from that premise, she disposes of my client's challenges to the maintenance, the challenge of the property. And the one thing I tried to do. There was no valuation for the house. Did anybody present an appraiser's report that showed how much the house was worth? No, but the undisputed trial testimony was the judge was advised at the trial that the house was listed for sale for $1.5 million. The undisputed evidence in trial was that there was over $1 million in liens on the house between the initial mortgage and the home equity line of credit. In the post-trial motion, the court was advised that the listing price had been reduced to $1.2 million and that the house hadn't sold. So how do we have a statement from the judge that says my client is going to get $900,000? I understand she ordered sold, but that was by stipulation of the party. So how do we get to a conclusion that my client is going to get $900,000 when the judge was advised it's listed for $1.2 million and there's $1 million in mortgages? My question is a little different. It's like how do you conclude that the judge concluded that your client was going to get $900,000? I do not agree that that's what the judge concluded. Your Honor, I've excerpted the judgment in the brief. It says my client, Thomas, will receive $900,000 upon the sale. And from that factual, from that, if you don't think that that's a factual finding, I'll read it from the record. Volume 2, C-280. Nevertheless, the circuit court found that Clayton will receive an estimated $900,000 upon the sale of the Merrill residence. If that's not a factual finding or at least a belief that the court had when it was deciding the rest of the financial issues in this case, I don't know what else you'd call that. Let's assume it's a factual finding. Okay. Where in the computation does the trial court use that number? There's no computations as to, okay, there was a balance sheet or a ledger created in the judgment. But that's the first point that I was trying to make is that the divorce statute, the property statute, the maintenance statute, the attorney's fee statute are all interrelated in the sense that Merrill property has to be valued and has to be valued correctly. From that, you can only make an equitable distribution. The maintenance statute, factor number one is what is the Merrill property that was distributed to each side? And if the Merrill property is an error, the maintenance is necessarily an error. Likewise, for attorney's fees, the contribution to attorney's fees are governed by the same property distribution factor. So, you know. I don't disagree with you. What I'm saying, where did the number fit in? Was there any analysis by the trial court? Okay, he's starting out with the $900,000. He's going to get this from us. So how does that make up from there? Where does that show up? It doesn't show up in the sense that there was a ledger or a balance sheet. But if you read the judgment, she clearly proceeded from that premise. And if she proceeds from such an erroneous premise, my position is, as a matter of law, the property distribution is an error because there's a substantial valuation error. There's only about a $1.7 million marital estate all in, let's say. So what's the usual analysis that a trial court goes through to find out what the distribution would be from the sale of the house? They would normally accept the evidence and say, okay, the house is listed for $1.5 million. There's $1 million worth of liens on it. And if we go by those numbers and it sells approximately, there will be approximately $400,000 left over. And I'll assume each side is going to get $200,000. But that's not what happened here. But I don't want to dwell too much on this because while I believe it is a factual finding and I don't see how it isn't. Counsel, putting the disputed value of the house aside, when the trial court distributed the marital assets, your client got 60% of the assets. Is that correct? That's how it was portrayed. That's correct, Your Honor. I don't, as I say in the brief, and I try to point the court to the issue of when the court is distributing marital assets, it isn't just numbers on a page. You have to look at the quality of the assets and what assets are being divided. Giving my client 60% of a whole when that 60% is made up almost entirely, save for his car. Let me ask you a couple of things. The wife had a Wells Fargo 401k plan. How much money was in that? Let me just check the judgment. There was $512,000 in change. Excuse me? And how was that divided? That was given to my, that was given 100% to my client. Your client got all of that? Yes. There was a profit-sharing, Van Deloitte and Touche had a profit-sharing account, and how much did your client get from that? He got 100% of that. And that was $237,339, right? That's correct. And he also had a Wells Fargo 401k, and that was $2,181, and he got all of that? That's correct. And then there was GMAC, there was $21,320, and he got all of that? That's the stipulated value for his car, yes. Okay. So your main concern is that the valuation, is there anything else other than the house and what I just mentioned that he got awarded, other than the house, is there anything else that you are questioning in terms of the valuation that the court may have made and how it was divided or how it will later be divided? Well, that's what I was getting at. You're putting aside a $900,000 valuation error, which I think taints all of the decisions as a matter of law by pursuant to the statutory factors. Independent of that, this court has said in a case called Scoville that I cited in the briefs, that it is error to effectively distribute all pre-tax retirement accounts to one side and try to portray that as an equitable division, or this was tried to portray as a 60% division. I mean, your Honor is reading me $512,000, $237,000. Those sound like big numbers. Those are all pre-tax retirement accounts. If my client wanted to access them now, there would be penalties. There would be early withdrawal penalties. There would be taxes if he didn't wait. So that's not a net number. Ms. Evanoff, in this case, received one part of one pre-tax retirement account and the rest effectively in cash. Just a basic question. What is the standard of review? Manifest weight. Manifest weight and abuse of discretion, Your Honor. Abuse of discretion. That's correct. And this court, that did not stop the court in the Scoville case from making the point that I'm precisely making, which, again, independent of the $900,000 issue. When one side has distributed all pre-tax retirement accounts, that's a basis to vacate the property award because it's apples and oranges. It's gross dollars versus net dollars. And to try to portray it as 60-40 is just not accurate. Counselor, can I ask you about the distinction between a May 1, 2013, financial affidavit that was provided by your client and what's referred to as Exhibit No. 11, which is termed Clay's actual expenses? Was there a big difference as far as what was reported between those two documents as far as your client's expenses? Just turn to it. Because that was the exhibit I think proffered by the other side in this case. And that was an attempt by the other side, which the circuit court accepted, that set forth what his expenses are, basically what he was expending while the case was going on. And I make the point in the brief that that's not the proper standard. And I don't think the other side in the blue brief makes any secret that the maintenance award in this case was based upon what Clay may have been spending while the case was going on. That's not the standard. The standard is what's the lifestyle of the marriage, not what these people spent during the divorce. You know, there was no temporary support hearing. Clay didn't, you know, urge the court, didn't want to go down that road of engaging in attorney's fees over temporary litigation. His wife put him on a very, you know, budget where she would give him money sometimes. Sometimes he would not have money. He would have to submit expenses to her. Was there any allegation that during the course of the pendency of this divorce, the standard of living for your client declined or changed to a lesser standard? Yes. There's testimony in the record that during the divorce he did not enjoy the same standard. That's testimony that came before the court. And that's borne out by the numbers. What did the court, did the court accept that testimony? Did the court accept the testimony? What was the finding of the court? There wasn't any findings. There was findings that these people had a relatively nice lifestyle. Their kids went to private schools. They took expensive vacations. But because my, what my position is, is my client's, my client cut back his expenses because of the uncertainty of this case. Okay? And was he spending less during the divorce case while the litigation was going on? This was his whole financial support. He stayed a home dad for 25 years. He didn't know what was going to happen. So he cut back his expenses because his whole future is unknown. And he ultimately gets penalized for it. So the circuit court is saying, okay, well, if you're not spending that much money, you don't get much money in maintenance every month. That type of thinking only encourages people to spend wildly while the case is going on. So because if you're going to spend more, you'll get more from the judge at the end of the day. Whereas if you don't, you're going to get less, despite the fact that that's undisputedly contrary to how these two people lived when they were happy and together. And that's the biggest problem with the amount of $4,300. It does not jive with the standard of living of the marriage. He does have another job, doesn't he? He has another job. Yeah, he sells wine. He makes about $25,000 a year. And, you know, if you include that income and you include what I consider the erroneous imputation by the circuit court to get him to what she thought he should be making, which was $40,000, even if you accept that imputation, the other side in this case, even counting the $4,300 worth of maintenance every month, is at about a five times disparity of the income. How is that fair on a 25-year marriage? You know, the new maintenance guidelines don't apply to this case because the family's income exceeds the $250,000 threshold. But if you wanted to even look at that, it would be much more than $4,300. It would be double, given the disparity of the income and the length of this marriage. You know, I take your points well taken. Your opponent, of course, makes the opposite argument, saying that, you know, that the wife's earnings, she certainly funded the majority, if not all, of the marital assets that are ultimately being divided. And despite all of that, she got the smaller share of the distribution. So, you know, it's hard for you to say that the trial judge was in some way unfair. I mean, I'm not sure what your argument is. That's what I'm trying to get to the bottom of. My argument is he didn't get 60 percent, and that's not true. He's not going to get anything from the house, and he didn't really get 60 percent. During the pendency of all this, the wife is still paying all of the expenses for the upkeep and whatever is required to keep the house going so that it's marketable. Is that correct? That's correct. That's because that's how they had done it since the beginning of this marriage. My client stayed at home, raised the children, gave up his professional career to, or any opportunity he might have had to go out and get a job like hers or educate himself. That's what they decided to do. So, yes, she was paying the bills because that's the way they did it. Okay, counsel. Well, you know, your obligation here is to show us where the trial court went against the manifest weight of the evidence. And just our opinion, was this fair or was it not fair, doesn't satisfy that criteria. But I want to get back to the house for a minute because I think in that area I think you have the smell of a case. What's the current status of the marital home? Not sold. Is it for sale? Not sold. What's it listed for? Less than what the record last revealed is less than a million dollars. So now it would be willingly sold for less than a million? My understanding is it's either been listed for sale. I've got a memory surge. It's either listed for less or the real estate advisor has advised to list it for less than a million. What's the mortgage balance currently? I mean, it can't be much less. It can't be much different. Still not 900? It's got to be at a 900 billion all in between the two. Okay. So if the court, in fact, felt he was getting a 50-50 on that equaling 900,000, there you do have a smell of a manifest weight of 11. That's correct, Your Honor. That's correct. I would certainly hope so. Any other area of the nine points you've filed an appeal where you would likewise have some sort of smell of a manifest weight of the evidence? I think the dissipation issue has legs, Your Honor. I think the fact that my client filed a notice to claim the dissipation for a quarter of $250,000, claiming that the transfers to the children's 529 accounts on the eve of the divorce and during the divorce was dissipation, I think the court's finding that it wasn't dissipation. It is against the manifest weight of the evidence. The evidence that the judge used to justify her reasoning was effectively a conversation that the two parties had over drinks in a bar five or six years earlier when they were talking about what they might do if the Eppley's stock was sold at a large profit. And the evidence was, as excerpted in the blue brief, that they had a conversation and they said, if that happens, we'll have a lot of money that we can use to help pay for college. And based upon that conversation, the judge found that there was an agreement to do this six years later when they're now getting divorced, despite the fact that my client was objecting and despite the fact that all $250,000 was effectively all of the marital liquid cash these two people had. Now, if the agreement, if the court found an agreement based upon a conversation they had five or six years earlier where the evidence showed, the record shows, that all that was said was, well, if we sell this stock for a bunch of money, we can help pay for college. How is that an agreement, help pay for college? I don't think you can say help pay for college in the sense that, yeah, he can take all of the money, she's authorized to take all of the money that we have and give it to the children in their 529 accounts right now that we're getting divorced. He never agreed to that. There's nothing remotely suggest he would ever agree to that. Counsel, let me ask you, let's assume that's not an abuse of discretion as far as the funds being used for the children's college. Just assume that. Where does the money revert after, if there's any money left from that? If there's any money left over from that, it goes to the parties equally, I think, pursuant to the judgment. Is that the distinction you make relative to the marriage of HEDD? I mean, how does that support your case? Well, HEDD is, HEDD found dissipation when there was transfers to educational trusts right before the divorce started. What I'm saying in this case is that by transferring the funds during the divorce, on the eve of the divorce, Ms. Evanoff had far greater liability to pay for college than my client did. Section 513 governs the allocation of college education or college education financial responsibility. It's based upon the ability of each party to pay and contribute. She would have a much higher, much greater responsibility to pay. This wouldn't have been a 50-50, 513 dispute. That's just not possible. She makes, historically, makes $400,000 to $500,000. My guy makes $25,000. He would not have been charged by any court under 513 to pay for half. But that's effectively what she accomplished by doing this. And it's my position that, despite it's for the children, that that finding of no dissipation is against the manifest weight of the evidence because the judge's finding is solely based on this conversation in a bar years earlier. And I'm sure if you asked my client when he was getting divorced, if you would ask him the same thing, can you take all of the money and give it to the children? Probably not. Why? Because his entire future is up in the air. He doesn't know what's happening. Also, one more question that I have. As far as the wife's income, the court used the last year of her income in the analysis rather than the last three years? That's correct. And what do you rely on as far as case law or the statute? There's a case that I cited from this court held it was error in the marriage of Friesen. This court held that when the income undisputedly fluctuates in the way that the appellees in this case does, it's error to only rely on the last taxable year. That's a holding from this court. And that's cited in my brief. Thank you. I want to back up just one second on the issue of income. One of the issues I also raised was the imputation of income to my clients, $11,000, which the court specifically factored in when she set my client's maintenance rate. She imputed $11,500. In the post-judgment order, she took $11,500 divided by 12 and said, I'm imputing $900 in whatever the math is to him every year. There's no evidence in the record to support that imputation. That is also against the manifest weight of the evidence. There wasn't an expert that testified that said Clay should be making X or Y. And so the finding was based on nothing more than what the judge thought he should be making. But that's not a basis to impute income. The Supreme Court has ratified the Gosney factors. The Gosney factors aren't applicable to this case. They aren't applicable to Clay. He's done what he can do to try to rehabilitate himself. He's worked odd jobs since the divorce. That's what happens when you stay home for 25 years and raise the children. Any further questions right now? Thank you. I'm going to keep my comments limited also. I was counsel of record for Ms. Evanoff both in the trial court and before this court. And this was a case where it was going into trial a one-issue case. It was all about the maintenance that Mr. Evanoff was seeking. And I believe that if you objectively look at the judgment for disillusioned merits that was entered in this case, Mr. Tomasek prevailed. He got permanent maintenance of more than $50,000 a year to supplement his income. Counsel for Mr. Tomasek told you that Mr. Tomasek was living a lifestyle that was that below which he had led and that the court didn't factor that into consideration. I think the common law record totally thwarts that argument. In fact, I recited in my brief that there was a line of questioning that I asked Mr. Evanoff because I wanted to know if he was going to make this claim that my client had somehow been punitive or somehow, as they try to portray, been the one dictating what his budget or his monthly allowance, which was going to be, which the record completely undermines. But I specifically asked volume 4, pages 23 or 24, Mr. Tomasek, what is it that now you don't have the money for that you had the money for before when the two of you were living together in husband and wife in a harmonious household? And Mr. Tomasek couldn't tell me anything. In fact, he said, you know, off the top of my head, I'd have to take some time to think about it. My follow-up question is, but as you sit here today now testifying, can you think of anything you can? No. Mr. Tomasek came in there looking for a windfall. The evidence dictates that when he decided to move out of the home, he was the one who set this course of conduct up where he said, this is where I'm going to live, this is where I'm going to be comfortable, this is what's going to allow me in the community I want to be to live the same lifestyle. And my client fell in line with him and gave him the monthly shortfall. And the exhibit that I believe Justice Connors asked about clearly was the exhibit that documented what my client had been paying Mr. Tomasek so he could live the style of life. I don't believe that there could have been any better evidence for the trial court to hear. Mr. Tomasek got what he wanted. He has permanent maintenance. It's non-reviewable. He has no duty to rehabilitate. He will receive this for the indefinite future, and I have to believe he's fit, he's able-bodied, and more than $50,000 a year will allow him to lead the lifestyle. Did the court commit an error in determining this portion on the marital home? I don't believe the court made any findings of that. The court couldn't make any findings. I can tell you this, that the judge simply accepted the stipulation of the parties that the house was going to be sold. She didn't have anyone come in there and testify, this is the value of the home. Mr. Tomasek elected not to bring in an expert to value that home and have them testify. Was your client's testimony that the mortgage was $900,000, something like that? The key move that's on the home is yes. At that time, at the time of the hearing, your client testified that the house was being listed for, I think, approximately $1.5 million. That is accurate. That is accurate, Your Honor. But I don't believe that there's no other evidence on these issues. There is no evidence. Nobody's presented any other evidence, and there was no finding made by the trial court, and I believe that this argument is solely made because they can't argue that the court erred in valuing the home. There was no valuation doing. What they're doing is they're trying to buttress their argument that he should get more money, that he should get more maintenance from my client. That's the sole grovelment of their argument of what this valuation error is. It's not as if he was getting all the equity and the court made a finding, there's $900,000, he's going to get it, and we're going to offset assets. That's by no means what happened here. So what happens on the sale of the home? Per the terms of the judgment, each party gets 50-50 of the proceeds from the sale of the home. My client's in the same position as to that in the real estate, and that really dovetails with the argument that counsel made, which I think is misplaced. He tries to rely on the Scoville case in which one party was awarded more retirement assets and the other party got more cash assets. That's not the case here. The trial court was presented with a merriless state. Trial court can't change that merrill state, and it just happens to be an incredibly illiquid merrill state. The gross majority of merrill assets were retirement savings. There was real estate equity, there was my client's capital account that's illiquid, and there were automobiles. There was no cash on hand here that could have been given. And there's no question about it, Mr. Tomasek did get 60% of every other merrill asset other than the real estate and the money that's still coming in from Arthur Anderson. But my client got 50% less of the gross majority of the merrill assets. I think that also ties in briefly with what I want to raise about the dissipation. The dissipation issues are extremely distinguishable upon a review of the common law record from those in head. In head, you had a husband who was moving ahead with divorce proceedings long before any children were on the cusp of or in college. And he took assets that had been longstanding assets that had been invested in a variety of different things and shifted them all into 529 accounts to prevent them from being divided. I raised two points. Counsel said to you, years and years ago there was this conversation in the bar. That could never have happened because here's the facts of the case. Is that my client received this stock in the form of a stock option when it was a privately held corporation. And she got those as part of the compensation she had at the time she was working there, five or six years beforehand. But that corporation didn't have an IPO and go public until just before these divorce proceedings were going to begin. And at that time, the parties had one child who was already in college, one child who was a senior in high school, and one child who was also in high school. And the parties acknowledged, we have no liquidity here to pay college education expenses. And my client did the appropriate thing. She took the money as it was coming in and could be exercised as stock options to stock in front of the children's 529 accounts. Purely of marital purpose, not dissipation. Also, I want to go back to the House for a minute. Is there anything in the record that shows the trial court took into consideration this alleged 900,000 hours that she was attributing to the husband upon the sale of the house? No. Anything in the computation? Nothing at all. Okay, continue. That's all I'd offer. I don't know if the panel has any other questions. Oh, yeah, I do. Okay. As far as the Gosney case, the factors relative to imputation, do you think the court abused discretion by not considering those, or did the court consider those? I think the court did consider those as a matter of law. The court heard a wealth of evidence that Mr. Tomasek was not making bona fide and reasonable efforts to seek appropriate employment. Mr. Tomasek hasn't been a lifelong wine person. Mr. Tomasek is an accomplished musician and recording artist who has a history of being in bands that have both publicly performed and been recording artists. That he just totally did nothing with the skills and acumen he had of that was appropriately considered by the court to say, this is something that's viable to you. You need no further education. You're not pursuing any further education, and you have this talent that you're not using. All right. Let me ask you about the assessment of the income. The court used the last income year in its assessment. It didn't use the last three years. What's your argument relative to that? That was wholly proper because there's a wealth of evidence that shows that this. My client was a partner at Deloitte. All of her ownership interests are subject to the management committee of that publicly traded entity, and because of my client's work performance, she had a reduction in her units. Units translate to income. It would have been improper for the court to use the prior year's income because it was based on her having a different unit holdings. There was all the evidence that was presented clearly established this was a determination that my client had no part of, and it had been a decrease in her stream of income, which needed to be factored into the maintenance calculation. Do you disagree with the Friesen case, then? Counsel cited. I do. The Friesen case is distinguishable because that's someone who's had the same type of income, that their income fluctuates, and they have a history of income fluctuating. Here, my client had a job that was changed. The ownership interest she had in this interest was beyond her control, and it wasn't going to change. She went from one unit holding to another unit holding, and to average those would have not been a proper calculation of my client's income at the time of the entry judgment. Is the house now being listed for less than a million? Not to the best of my knowledge, no. To the best of my knowledge, there has been price decreases, but by no means $500,000. Thank you. Any other questions? Thank you for your time. Just going back to the $900,000 issue again, I don't want to dwell too much on it, but if it's in the court's judgment and that's what the judge said she was at least basing part of her ruling on, or at least that's something that she thought was true, whether the law recognizes it as a factual finding or something else, it's there. And I don't know how else we can construe a judgment other than to say this is what this judge thought to be true, and that fact provides the basis for any of the other decisions, the financial decisions in the case. What do we do with it? It's undisputedly incorrect. Does it rise to the level of a factual finding? Does it need to? If it's in the judgment, what else is it? It's what this judge thought. With respect to the dissipation, counsel made the comment that the burial estate was illiquid, and that justifies the giving my client all those hiring accounts, and that gets them out of the Scoville case. But the burial estate was illiquid because she gave all the money to the children. That's the point I'm trying to emphasize with respect to the dissipation. They had no liquidity because she gave it all away to the kids. The conversation held five or six years earlier with respect to the stock. I didn't suggest in the brief, nor did the evidence suggest that they had the money at that time. She got the stock options at that time, and they were musing that, well, if the stock goes through the roof, we'll have a lot of money. That came to fruition around the time of the divorce, and yes, that's when she transferred the money. But my client never agreed that she could give away all of their money to the children. And what she's effectively done is allow herself only to be allocated a 50 percent responsibility for college, which is not something that would occur under a proper adjudication of the rights under 513. The court has any further questions? I thank you for your time. Thank you. Thank you very much, both sides. This matter will be taken under advisement. Court is adjourned.